UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSHUA NATTINGER,
    Third-Party Plaintiff,

v.

NATIONWIDE MUTUAL FIRE INS. CO.,
    Third-Party Defendant.

No. 3:08cv1275 (SRU)

## MEMORANDUM OF DECISION

This case is an insurance coverage dispute arising from a residential fire in Woodbury, Connecticut on October 18, 2007. At the time of the fire the plaintiff,[1] Joshua Nattinger, was working as a painter at the house where the fire occurred. The fire was caused by Nattinger's negligent use of a heat gun. The relevant question for this court is whether, at the time of the fire, Nattinger was covered by the insurance policy of his general contractor/employer, Elite Painting.

A bench trial began and ended on May 2, 2011. Because I find that Nattinger was an independent contractor, I find in favor of the defendant. My findings of fact and conclusions of law are set forth below.

### I. Background

In October 2007, Nattinger was working as a painter at the home of Stephen C. Bandy, in Woodbury, Connecticut. Exs. 18B at 2, 13; 19 at 61. Elite Painting, LLC ("Elite"), whose sole

---

[1] This lawsuit was initiated by Vigilant Insurance Company ("Vigilant") as a subrogee of its insured, Stephen Bandy. Nattinger was named as the defendant in that case. Nattinger, in turn, brought a third-party complaint against Nationwide Mutual Fire Insurance Company ("Nationwide"). Nattinger and Vigilant subsequently settled their claims, leaving Nattinger as plaintiff and Nationwide as defendant on the remaining claim.

Nattinger is a Connecticut resident, and Nationwide is a corporation with its primary place of business in Ohio. The amount at issue exceeds $75,000. Accordingly, the court has diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332.

member is Mark Wilkes, contracted to perform that painting job. Ex. 7. Nattinger was working for Elite, either as an employee or independent contractor. Joint stipulations ("J. stips.") 30, 31.

On October 18, 2007, Nattinger's negligent use of a heat gun on the exterior of the Bandy home caused a fire. J. stip. 59. At the time, Nattinger had an insurance policy with Utica First Insurance Company ("Utica").[2] J. Stip. 4; ex. 19 at 34-35. Elite had a commercial general liability policy with Nationwide. J. stip. 6; ex. 18 at 47.

Nattinger now claims that any damage caused by him is covered by Elite's policy with Nationwide. That policy states that it covers "'employees,' other than 'executive officers', but only for acts within the scope of their employment by [Elite]." Ex. 1 at 7. "Employees" are defined as "includ[ing] a 'leased worker,'" but not "a 'temporary worker.'" *Id*. at 10.[3] The question for this court, then, is whether Nattinger was an "employee" of Elite within the meaning of the Nationwide insurance contract, and if so, whether his actions that caused the fire were within the scope of his employment.

## II. Discussion

### A. The Nationwide Policy Does Not Cover Independent Contractors

Connecticut law is clear that "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance

---

[2] Although Nattinger is ostensibly the third-party plaintiff in this case, in actuality it is Utica that is bringing the claim. That is why at times it appears that Nattinger is asserting contradictory propositions: Nattinger the individual has long believed himself to be a subcontractor; Utica-through-Nattinger is now arguing that Nattinger is instead an employee.

[3] Elsewhere, a "leased worker" is defined as "a person leased to [Elite] by a labor leasing firm under an agreement between [Elite] and the labor leasing firm, to perform duties related to the conduct of [Elite's] business. 'Leased worker' does not include a 'temporary worker.'" *Id*. at 11.

A "temporary worker" is defined as "a person who is furnished to [Elite] to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Id*. at 12.

with the real intent of the parties as expressed in the language employed in the policy." *Voris v. Middlesex Mut. Assurance Co.*, 297 Conn. 589, 595 (2010). Moreover, the "policy words must be accorded their natural and ordinary meaning." *Enviro Express, Inc. v. AIU Ins. Co.*, 279 Conn. 194, 199 (2006). Although "any ambiguity in the terms of an insurance policy must be construed in favor of the insured," "[t]his rule of construction may not be applied . . . unless the policy terms are indeed ambiguous." *Id*.

It is clear from the plain language of the Nationwide policy that it covered acts by Elite's employees. It is also clear that an independent contractor is not an employee. The very definition of independent contract notes that it is "unlike an employee." Black's Law Dictionary 839 (9th ed. 2009). Indeed, Connecticut courts have frequently taken up the question whether an individual is an employee or an independent contractor, further demonstrating that the two are mutually exclusive terms. *See, e.g., Tianti v. William Raveis Real Estate, Inc.*, 231 Conn. 690 (1995); *Latimer v. Administrator, Unemployment Compensation Act*, 216 Conn. 237 (1990); *Nationwide Mut. Ins. Co. v. Allen*, 83 Conn. App. 526 (2004).

Thus, if Nattinger is an independent contractor, he is not covered by the Nationwide policy; if he is an employee, he might be.

B. <u>Nattinger was an Independent Contractor</u>

1. *Elite's Control of Nattinger*

In determining whether a worker is an employee or independent contractor, courts typically look to the level of control exercised over the worker. *Allen*, 83 Conn. App. at 534. "It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." *Id.* (quoting *Tianti*, 231 Conn. at 697).

3

The evidence introduced at trial suggests that Elite did not control Nattinger, or have the right to do so. Both Nattinger and Wilkes indicated that Wilkes did not give Nattinger instructions on how to perform his work. Exs. 18 at 139-40; 19 at 90, 119-20. Although Wilkes would occasionally, in the beginning of the relationship, give Nattinger "tips," j. stip. 16; ex. 18 at 18-19, Wilkes did not give Nattinger instructions on how the work must be performed.

The evidence also indicates that Nattinger was able to set his own hours. Although Nattinger would occasionally ask Wilkes to check with Elite's clients and determine how early they would be comfortable with him arriving at their residences, Wilkes did not dictate Nattinger's daily schedule. J. stip. 18; ex. 18 at 154; ex. 19 at 98, 171. The workers on the Bandy job would try to coordinate their arrival time, j. stip. 38. That does not indicate that their hours were controlled by Elite, but only that it was most practical to work together.

Before Nattinger began work on the Bandy site, he discussed with Wilkes how he was going to approach the job. Ex. 19 at 97-98. Nattinger did not state, however, that Wilkes had control over how he would perform his work; instead, it appears that the two were merely trying to coordinate how the work would be done, since Nattinger was not the only worker on the site. At trial, Wilkes testified that although he and Nattinger discussed how to approach the job, he did not give Nattinger instructions, or direct him to take a particular approach.

The evidence does not indicate, for example, that Wilkes directed Nattinger to use the heat gun on the Bandy job. Although Wilkes knew that Nattinger would be using a heat gun, he does not remember whether it was his idea, or Nattinger's. Ex. 18 at 97. Nattinger believes that it was his own decision to use the heat gun. Ex. 19 at 54-55.

Wilkes has stated that he did not supervise Nattinger, but would instead try to ensure that Nattinger's work was up to a "certain standard." Ex. 18 at 14. Although Wilkes may have had

4

control over the final product of Nattinger's work, that does not indicate that Nattinger was an employee; an independent contractor is one who "contracts to do a piece of work according to his own methods and without being subject to the control of his employer, *except as to the result of his work*." *Ceslik v. Miller Ford, Inc.*, 584 F. Supp. 2d 433, 445 (D. Conn. 2008) (quoting *Menzie v. Windham Cmty. Mem'l Hosp.*, 774 F. Supp. 91, 94 (D. Conn. 1991)) (emphasis added).

Connecticut courts have noted that one important consideration in determining whether a worker was an employee or independent contractor is whether that individual was monitored. *Latimer*, 216 Conn. at 250-51; *Allen*, 83 Conn. App. at 536. The courts have reasoned that evidence of monitoring indicates that the supervisor could have intervened if the work had not been performed adequately. *Latimer*, 216 Conn. at 250-51. Nattinger was often unmonitored. During the course of Wilkes' and Nattinger's working relationship, it was common for Wilkes to be off on other jobs while Nattinger was working. J. stip. 58. Indeed, at the time of the fire, Wilkes was away from the Bandy jobsite.

2. *Nattinger's Establishment of Anders Painting*

One of the most striking features about Nattinger's relationship with Elite is that both parties – Nattinger and Elite, through Wilkes – clearly wished to establish a general contractor/subcontractor relationship, as opposed to an employer/employee relationship. In furtherance of that goal, Nattinger took active steps to establish a business through which he could operate as an independent contractor.

Nattinger had a sole proprietorship, Anders Painting, that was doing business in 2007. Ex. 19 at 7-8. Nattinger paid taxes and submitted tax returns for his painting business, j. stip. 25, and Elite did not withhold or pay taxes on Nattinger's behalf. J. stip. 24. *See also* j. stip. 24

5

(Nattinger's 2007 W-9 lists his name as well as that of his sole proprietorship, and in 2005-2007 Elite issued 1099 forms to Nattinger); ex. 18 at 143-45. These factors suggest that Nattinger was an independent contractor, not an employee. *Tianti*, 231 Conn. at 699.

Nattinger had his own insurance and workers' compensation policy to cover the work done for Anders Painting.[4] J. stip. 60; exs. 17; 19 at 86; 19C, 19D, *see also* ex. 19 at 77 (Nattinger showed Elite that he carried his own insurance). Nattinger at one point printed business cards for Anders Painting, which he distributed. J. stip. 28. And on at least one occasion, Nattinger competed with Elite for a painting job. Ex. 18 at 174.

Courts have noted that a lack ownership of the tools and materials necessary to complete the work can indicate that a worker is an employee. *Allen*, 83 Conn. App. at 536. Although Wilkes did bring several tools to the Bandy job, including a plank, sander, respirator, filters, sandpaper, caulk, and a grinder, j. stip. 45, Nattinger also brought many of his own tools, including a heat gun, respirator, respirator filters, and ladders. J. stip. 46; ex. 18 at 167; ex. 19 at 19-20, 59, 90. Nattinger, in short, had enough materials to operate as an independent contractor.

Nattinger insists that the regularity with which he worked for Elite shows that he was an employee, not an independent contractor. Nattinger cannot remember having declined an Elite job, ex. 19 at 57, and when Elite had work, Wilkes typically offered work to Nattinger, ex. 18 at 41. But that does not mean that Elite was obligated to give work to Nattinger, or that Nattinger felt obligated to accept it. In fact, according to Nattinger, he felt free to reject Elite's offers of work. Ex. 19 at 95-96, 107-08. At various points, Nattinger did perform work for other contractors. *See* ex. 18 at 147, 149 (Wilkes' testimony that there were times when Nattinger was

---

[4] Although the policies with Utica list Nattinger, not Anders Painting, as the insured, they also state that they are "business owners'" insurance policies covering liability and workers' compensation. *See* ex. 17, 19C, 19D.

unable to work for Wilkes because he was working for another painter); ex. 19 at 56 (Nattinger's testimony that he worked for Elite 70-80% of his professional time); ex. 19 at 88, 102 (Nattinger's testimony that in 2007 he did painting jobs for persons or contractors other than Elite); j. stip. 26 (between 2003 and 2004 Nattinger worked with a contractor named "Brett"; at trial Nattinger stated that he may have worked for Brett as late as 2005); j. stip. 27 (Nattinger performed work for someone besides Elite about six months to a year before the Bandy job).

A party's attempt to establish independent contractor status is not always successful. For instance, in *Latimer*, the Court held that the workers in question were employees, despite the fact that they had signed an agreement providing that "[worker] is an independent contractor unless otherwise employed directly by the . . . Client." 216 Conn. at 240 n.7. In that case, however, the employees were monitored, and had to report their daily activities. *Id*. at 250-51. They also did not pay their own taxes or provide their own insurance. *Id*. at 240 n.7, 244. They had, in short, done little more than declare themselves independent contractors. In this case, in contrast, Nattinger took active steps to form his own business. The facts demonstrate that Nattinger was actually doing business as an independent contractor, not merely declaring that he was not an employee.

3. *Other Factors*

At trial, the plaintiff repeatedly pointed to two different factors he believed demonstrated that Nattinger was an employee: the fact that Nattinger was paid an hourly wage by Elite, and the fact that Elite had represented to others that Nattinger was an employee.

The evidence is clear that Elite always paid Nattinger by the hour. J. stip. 19. In Connecticut, "payment of a worker at an hourly rate . . . is persuasive evidence that the status of a worker is that of an employee rather than that of an independent contractor." *Allen*, 83 Conn.

7

App. at 536 (quoting *Latimer*, 216 Conn. 237). Although it is persuasive evidence, it is not dispositive. Here, Nattinger had taken steps to establish his own company and do business through it, which negates the inference that he was an employee. Moreover, Elite exercised little, if any, control over Nattinger or his company. Therefore, the fact that Nattinger was paid an hourly wage is not enough to conclude he was an employee.

Nattinger's argument that Elite held him out as an employee is even less persuasive. On at least one occasion Nattinger wore an "Elite Painting" t-shirt to the Bandy job. Exs. 18 at 111-12; 19 at 70. Yet it is equally clear that Nattinger was not required to wear the shirt. Exs. 18 at 156-57; 19 at 127. Elite gave out shirts to anyone who would wear them, as a form of low-cost advertising. Exs. 18 at 156-57; 19 at 174-75. According to Nattinger, Wilkes also would give the shirt to plumbers and electricians, ex. 19 at 175, even though those individuals were clearly not employees of Elite Painting.

The plaintiff next argues that Elite represented to Bandy via contract that Nattinger was an employee. The plaintiff's argument hinges on a contract between Bandy and Elite dated July 16, 2007. Ex. 7. The contract has a section entitled "labor costs," which states, in part, that "[a]ll wages of construction workers directly employed by Contractor to perform the work described in the contract will be paid by the Rate Schedule below." The contract then listed three employees: Wilkes, and two unnamed "Journeymen painter[s]."

The plaintiff argues that this language demonstrates that Elite represented to Bandy that there would be employees working on the job. The plain language of the contract does not say so, however. Instead, the language merely states that if the Contractor <u>does</u> directly employ

8

workers, he will pay them at the listed rates.[5]  A contract provision setting forth <u>how</u> direct employees will be paid offers no help in determining <u>who</u> is a direct employee.  Furthermore, it is undisputed that Wilkes never told Bandy that Nattinger was either a subcontractor or an independent employee.  J. stip. 41; ex. 6.

The bulk of the evidence demonstrates that Nattinger deliberately set up an independent entity, Anders Painting, under which he was doing business at the time of the Bandy fire.  Nattinger was not an Elite employee, but was instead an independent contractor.  As such, Nattinger cannot recover from Elite's insurance company, Nationwide.

    C.  <u>Nationwide Had No Duty to Defend</u>

Nattinger also argues that Nationwide had an obligation to defend him in the lawsuit brought by Vigilant.  Because Nattinger was an independent contractor, and thus not covered under Nationwide's policy, Nationwide had no duty to defend him.

**III.**    **Conclusion**

For the stated reasons, I find in favor of the **defendant**.  The clerk shall enter judgment and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut this 18th day of May 2011.

                                                  /s/ Stefan R. Underhill
                                                  Stefan R. Underhill
                                                  United States District Judge

---

[5] Wilkes notes that the contract was created by a computer program that contains boilerplate language that can't be changed.  Ex. 18 at 126, 150.  He states that he would not have chosen to write "employee," in the contract, and he did not mean to indicate that Nattinger was an employee.  *Id*. at 151.  No testimony was presented by Bandy regarding whether or not he believed the contract to indicate that Nattinger was an Elite employee.